UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCAS E. MCCARN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HSBC USA, INC., et al.,<br><br>Defendants. | 1:12-cv-00375 LJO SKO<br><br>ORDER GRANTING MORTGAGE GUARANTY INSURANCE CORP., PMI MORTGAGE INSURANCE CO., RADIAN GUARANTY INC., AND REPUBLIC MORTGAGE INSURANCE CO.'S MOTION TO DISMISS (DOC. 54). |

## I. INTRODUCTION

On March 12, 2012, Plaintiff filed a putative class-action complaint asserting, among other things, that defendants HSBC USA, Inc.; HSBC Bank USA, N.A.; HSBC Mortgage Corp.; HSBC Reinsurance (USA), Inc. ("HSBC RE") (collectively, "HSBC Defendants"); United Guaranty Residential Insurance Co. ("United Guaranty"), PMI Mortgage Insurance Co., ("PMI"), Genworth Mortgage Insurance Corp. ("Genworth"); Republic Mortgage Insurance Co. ("Republic"); Mortgage Guaranty Insurance Corp. ("MGIC"); and Radian Guaranty, Inc. ("Radian") violated the Real Estate Settlement Procedures Act of 1974 ("RESPA").

On May 12, 2012, a partial stay of this action was entered pending the outcome of the United

1

States Supreme Court's decision in *First American Financial Corporation, et al. v. Edwards*.[1] The Court granted MGIC, PMI, Republic, and Radian's request for a limited exception to the stay permitting them to pursue a previously-filed motion to dismiss all claims against them for lack of standing. Doc. 68. The motion was originally set for hearing on May 9, 2012, but the hearing was vacated and the matter was submitted on the papers. Doc. 68. In addition to the motion, opposition, and reply, Docs. 54, 64 & 67, the Court has considered notices of supplemental authority filed by Plaintiff on May 7 and 8, 2012, Docs. 69 & 70, as well as Moving Defendants' response thereto, Doc. 71.

## II. BACKGROUND

Plaintiff Lucas E. McCarn obtained a mortgage loan from HSBC Mortgage Corp. on or about November 21, 2006. Doc. 1, Compl., at ¶ 19. In connection with the loan, Plaintiff was required to and did pay for private mortgage insurance ("PMI") in the amount of $154.40 per month. *Id*. It is alleged that borrowers do not generally have any opportunity to comparison-shop for mortgage insurance, which is arranged by the lender. *Id*. at ¶ 41. United Guaranty was selected by HSBC to provide PMI to Plaintiff. *Id*. at 19.

United Guaranty was a PMI provider with whom HSBC had a "captive reinsurance arrangement," whereby HSBC required the provider, as a condition of doing business with HSBC, to purchase reinsurance from HSBC RE, an HSBC subsidiary. *See id*. at ¶ 1. It is alleged that this type of arrangement was widespread throughout the mortgage lending marketplace and that it amounted to, in essence, the lender "coercing [PMI] insurers into cutting [the lender] in on … [lucrative] insurance premiums in exchange for assuming little or no risk." *Id*. at ¶ 3.

These captive reinsurance arrangements were the subject of some regulatory attention in light of anti-kickback provisions contained within RESPA. *Id*. at ¶ 80-84. According to a 1997 letter issued by

---

[1] *See Edwards v. First Am. Corp.*, 610 F.3d 514 (9th Cir. 2010), cert. granted in part by *First Am. Fin. Corp. v. Edwards*, 131 S. Ct. 3022 (Jun. 20, 2011).

2

the United States Department of Housing and Urban Development ("HUD"), the agency charged with enforcing RESPA during most of the class period, *see id*. at ¶ 43, captive PMI reinsurance arrangements were permissible under RESPA only if "the payments to the affiliated reinsurer: (1) are for reinsurance services 'actually furnished or for services performed' and (2) are bona fide compensation that does not exceed the value of such services," *id*. at ¶ 81 (citing *id*., Exh. M at 3). The HUD letter warned: "The reinsurance transaction cannot be a sham under which premium payments … are given to the reinsurer even though there is no reasonable expectation that the reinsurer will ever have to pay claims." *Id*. The complaint alleges that the type of reinsurance agreement utilized by HSBC with its PMI providers violated RESPA. *See id*. at 80-84.

The crux of the present motion concerns the undisputed fact that HSBC had the same or substantially similar captive reinsurance arrangements not only with United Guaranty, the provider of PMI to Plaintiff, but also with the other PMI Defendants, including Moving Defendants, MGIC, PMI, Republic, and Radian. Even though Plaintiff admittedly was not in privity with any of the Moving Defendants, he alleges all Defendants "acted in concert" to "effectuate a captive reinsurance scheme." *Id*. at ¶ 1. Plaintiff alleges that Defendants' "coordinated actions resulted in a reduction of competition in the mortgage insurance market and resulted in increased premiums for Plaintiff and the [putative] class." *Id*. at ¶ 15. On the one hand, the complaint generally alleges that "[i]n return for guaranteeing a steady stream of business, the private mortgage insurer ceded to the reinsurer a portion of the premiums it received from borrowers with respect to the loans involved," *id*. at ¶ 54, and that the "private mortgage insurer stimulates/guarantees its business by providing a lucrative stream of revenue for the lender via the lender's captive reinsurer." *Id*. at ¶ 77.

> Upon information and belief, the Private Mortgage Insurers participated in the scheme simply because the lenders produced business for them and they would not have access to the significant lenders if they did not agree to participate in the reinsurance arrangements. Notably, upon information and belief, each of the Private Mortgage Insurers participated without demur and not one attempted to put an end to the lenders' activities by reporting the conduct to the authorities. Defendants' coordinated actions resulted in a reduction of

competition in the mortgage insurance market and resulted in increased premiums for Plaintiffs and the Class. *See generally*, 12 U.S.C. § 2601(b).

*Id*. at ¶ 97. At the same time, it is also alleged that United Guaranty and the Moving Defendants "effectively had no choice but to enter into virtually identical reinsurance contracts with HSBC RE or risk losing doing business." *Id*. at ¶ 14.

### III. STANDARD OF DECISION

The present motion challenges Plaintiff's standing to sue any of the Moving Defendants pursuant to Fed. R. Civ. Pro 12(b)(1), which provides for dismissal of an action for "lack of subject-matter jurisdiction." Faced with a Rule 12(b)(1) motion, a plaintiff bears the burden of proving the existence of the court's subject matter jurisdiction. *Thompson v. McCombe*, 99 F.3d 352, 353 (9th Cir. 1996). A federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears. *Gen. Atomic Co. v. United Nuclear Corp.*, 655 F.2d 968, 968–69 (9th Cir. 1981).

A challenge to subject matter jurisdiction may be facial or factual. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). As explained in *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1038 (9th Cir. 2004):

> In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction.

In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment. *Savage v. Glendale Union High School*, 343 F.3d 1036, 1039 n. 2 (9th Cir. 2003); *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988).

The present motion is a facial attack on the sufficiency of the allegations in the complaint. The standards used to resolve motions to dismiss under Rule 12(b)(6) are relevant to disposition of a facial attack under 12(b)(1). *See Cassirer v. Kingdom of Spain*, 580 F.3d 1048, 1052 n.2 (9th Cir. 2009)

4

(applying *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) to a motion to dismiss for lack of subject matter jurisdiction).  Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks sufficient facts to support a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). To sufficiently state a claim to relief and survive a 12(b)(6) motion, the pleading "does not need detailed factual allegations" but the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Id*.  Rather, there must be "enough facts to state a claim to relief that is plausible on its face." *Id*. at 570.  In other words, the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 129 S. Ct. at 1949 (internal quotation marks omitted).  The Ninth Circuit has summarized the governing standard, in light of *Twombly* and *Iqbal*, as follows: "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (internal quotation marks omitted).

      The *Twombly/Iqbal* standard as articulated in *Moss* is consistent with Ninth Circuit precedent requiring, "[t]he party seeking to invoke the jurisdiction of the federal Courts" to allege at the pleading stage "specific facts sufficient to satisfy" all of the elements of standing for each claim he seeks to press. *Schmier v. U.S. Court of Appeals for Ninth Circuit*, 279 F.3d 817, 821 (9th Cir. 2002).  "A federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing." *Whitmore v. Arkansas*, 495 U.S. 149, 155-56, (1990).  "It is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990).  "The facts to show standing must be clearly apparent on the face of the complaint." *Baker v. United States*, 722 F.2d 517, 518 (9th Cir. 1983).  However, contrary to Federal Defendant's assertions, the factual allegations need not be made with particularity beyond that required by

*Twombly/Iqbal*. Applying *Moss*, 572 F.3d at 969, standing may be based on "non-conclusory factual content, and reasonable inferences from that content," in the complaint that are "plausibly suggestive" of the existence of standing.

## IV. DISCUSSION

"Because standing and ripeness pertain to federal courts' subject matter jurisdiction, they are properly raised in a Rule 12(b)(1) motion to dismiss." *Chandler v. State Farm Mut. Auto Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010).

> "The irreducible constitutional minimum of standing contains three elements," all of which the party invoking federal jurisdiction bears the burden of establishing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). First, the plaintiff must prove that he suffered an "injury in fact," i.e., an "invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id*. at 560 (citations, internal quotation marks, and footnote omitted). Second, the plaintiff must establish a causal connection by proving that [his] injury is fairly traceable to the challenged conduct of the defendant. *Id*. at 560-61. Third, the plaintiff must show that her injury will likely be redressed by a favorable decision. *Id*. at 561.

*Id*. Plaintiff has the burden of establishing standing. *Id*. At the motion to dismiss stage, the Court must "accept as true all material allegations in the complaint and construe the complaint in the nonmovant's favor. *Id*. at 1121. If a plaintiff cannot demonstrate the elements of standing, the action is not a "case or controversy" amenable to adjudication by an Article III court. *Cetacean Community v. Bush*, 386. F3d 1169, 1175 (9th Cir. 2004). "In that event, the suit should be dismissed under Rule 12(b)(1)." *Id*.

The thrust of the present motion is that Plaintiff lacks standing to sue Moving Defendants because none of the Moving Defendants provided private mortgage insurance for Plaintiff's loan, and, therefore, Plaintiff's injuries are not causally connected (i.e. fairly traceable) to Moving Defendants' actions. Doc. 54. It is undisputed that Plaintiff obtained private mortgage insurance from United Guarantee, a Defendant, but not one of the Moving Defendants. Plaintiff maintains, however, that the Complaint provides "ample allegations of agreement and the conscious decisions made by each defendant, including the Moving Defendants[,] to participate in the improper scheme, sufficiently

6

linking them together such that they can be held responsible for Plaintiff's injury and supporting a finding of Article III standing." Doc. 64 at 11.

Moving Defendants contend that Plaintiff has at most alleged a "rimless hub and spoke" conspiracy, wherein each Moving Defendant is a spoke in a "conspiracy," but where there is no connection between (or "rim" joining) the spokes to one another. In *Kotteakos v. United States*, 328 U.S. 750, 755 (1946), the Supreme Court explained that a rimless wheel conspiracy should not be treated as a single, general conspiracy, but instead as multiple conspiracies between the common defendant and each of the other defendants. *Id*. at 768–69, 772[2]; *see also Dickson v. Microsoft Corp*., 309 F.3d 193, 204-05 (4th Cir. 2002). To be actionable, a hub-and-spoke conspiracy must have a "rim," which requires some kind of agreement or understanding between and among the spokes that the other spokes would cooperate in the conspiracy. *In re Nat'l Ass'n of Music Merchants, Musical Instruments and Equip. Antitrust Litig*., 2011 WL 3702453 (S.D. Cal. Aug. 22, 2011) (reviewing relevant caselaw).

Plaintiff asserts that he has alleged a "rim" by alleging that all of the PMI defendants were aware of and had knowledge of the other PMI's participation in the scheme. Doc. 64 at 11. "The Moving Defendants participated in and agreed to participate in the scheme because they knew that should they not agree, they would be punished by not being included in HSBC's rotational assignment of PMI business. *Id*. (citing Compl. ¶ 92, Request for Judicial Notice Ex. E).

At least one district court in California found the existence of a "rim" under somewhat similar circumstances. *Samp v. J.P. Morgan Chase Bank*, 5:11-cv-01950 VAP SP (C.D. Cal), concerned three couples that obtained home mortgage loans from J.P. Morgan Chase Bank ("Chase"). Doc. 70-1, May 7, 2012 Order in *Samp*, internal docket # 125. Chase required each couple to purchase private mortgage

---

[2] Plaintiff points out that *Kotteakos* did not specifically address standing, but instead concerned whether a particular hub-and-spoke conspiracy was adequately pled on the merits. *See* Doc. 64 at 10. However, this does not make *Kotteakos*' holding any less relevant to the present standing challenge. Plaintiff must establish that any injury he suffered is fairly traceable to the actions of the Moving Defendants. Plaintiff's own theory of the case connects the Moving Defendants to his injury by way of a purported hub-and-spoke conspiracy. If that conspiracy is not properly alleged, Plaintiff has failed to establish a causal connection.

7

insurance from three different insurers, Genworth, Republic, and United Guaranty, respectively. *Id*. at 2. The three couples sued Chase, Chase's captive reinsurer, the three directly involved PMIs, as well as four additional PMIs, alleging RESPA violations. *Id*. at 1-3. The four PMI's not directly in privity with any plaintiff moved to dismiss, arguing, as in this case, that the plaintiffs lacked standing to sue them because they were not the private mortgage insurers for any of plaintiffs' mortgage loans. *Id*. at 8. The district court described the allegations in the *Samp* complaint as follows.

> Specifically, Plaintiffs allege the Private Mortgage Insurers conspired amongst themselves and JPMorgan to establish the Captive Reinsurer Defendant and, in exchange for steering home buyers to the Private Mortgage Insurers, JPMorgan demanded the Private Mortgage Insurers agree to reinsurance transactions with those insurers. (FAC ¶ 65.) Under Plaintiffs' theory, each Private Mortgage Insurer agreed to participate in the scheme because JPMorgan guaranteed customers to each insurer in exchange for a percentage return disguised as a reinsurance premium. <u>If, however, any of the Private Mortgage Insurers declined to participate, the remaining Defendants could not maintain the scheme. Hence, Plaintiffs contend, each of the Private Mortgage Insurers, including Moving Defendants, were aware of the actions of the others, and were engaged in a single, overarching scheme; i.e., a "rimmed wheel" conspiracy</u>. *See In re Nat'l Ass'n of Music Merchs., Musical Instruments and Equip. Antitrust Litig.*, MDL No. 2121, 2011 WL 3702453, at * 5 (S.D. Cal. Aug. 22, 2011) (A "rimmed wheel" conspiracy, by contrast, involves either an agreement or understanding that other 'spokes' would cooperate in the conspiracy." (citing *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 931-36 (7th Cir. 2000))).

*Id*. at 10 (emphasis added). Assuming the truth of the above-described allegations, the *Samp* court found that plaintiffs had sufficiently alleged all of the named PMI providers participated in a scheme sufficient to afford plaintiffs standing to sue. *Id*. at 8-12. Critical to this reasoning is the allegation that if any of the PMI insurer's declined to participate, the remaining insurers could not maintain the scheme. Moving Defendants suggest there is no such allegation contained in the S*amp* Complaint. Doc. 71 at 4. They appear to be mistaken, as the First Amended Complaint in *Samp* alleges: "If one of the nation's private mortgage insurers did not participate in the conspiracy/scheme, and made public what happened, this scheme would have unraveled." *Samp*, Doc. 79.

However, <u>no such allegation is contained in the Complaint in this case, nor can such facts reasonably be inferred from the facts presently alleged</u>. It is equally if not more logical to assume that,

8

from the perspective of any one PMI, because the PMIs were all competing for business among each other, the fewer the other PMI's who participated in the "scheme" the better, as this would leave more business for those who did participate. The Complaint effectively concedes that the PMIs did not like the arrangement but "effectively had no choice but to enter into virtually identical reinsurance contracts with HSBC RE or risk losing doing business." *Id*. at ¶ 14.[3] In addition, the Complaint incorporates by reference an article that describes what happened when one PMI attempted to withdraw from a similar captive reinsurance arrangement with another lender. In short, the scheme did not unravel.[4] The Complaint in this case suggests the allegations in *Samp* are inaccurate or at least inapplicable. *Samp* is therefore not persuasive.

Here, Plaintiff suggests a single, over-arching "rimmed" conspiracy existed because each PMI "acted with the full awareness that their fellow mortgage insurance providers were doing the same thing," thereby "ensuring their share of HSBC's referrals, which were allocated [] on a rotating basis." Doc. 1, Compl. at ¶¶ 92, 97, 167. Plaintiff also emphasizes that none of the Moving Defendants or other involved PMIs did anything to thwart the scheme or remove themselves from it." *Id*. at ¶¶ 76, 85, 97. Plaintiff argues "[t]his scheme was successful because the private mortgage insurance industry is

---

[3] Plaintiff provides a supplemental citation to *Spears v. First American eAppraiseIT*, 2012 WL 1438709 (N.D. Cal. Apr. 25, 2012). There, plaintiffs claimed a lender conspired with an appraisal company to inflate the appraised value of properties under its mortgage loans so the lender could re-sell the mortgages at inflated prices. The district court found that the complaint sufficiently alleged an unlawful agreement (or conspiracy) between the lender and eAppraiseIT, even though the appraiser agreed to inflate appraisal values only in response to pressure from the lender. *Id*. at *3. Plaintiff cites this case to establish that a conspiracy may still exist even where one conspirator pressures the other into participation. *See* Doc. 69 at 2. This, however, does nothing to help establish that the multiple agreements at issue in this case should be treated as one, singular conspiracy. Earlier rulings in the *Spears* case suggest otherwise. The plaintiffs in *Spears* originally tried to sue not only eAppraiseIT, but also Lender's Service Inc. ("LSI"), another appraisal service provider that allegedly engaged in similar appraisal inflation at the behest of the lender. Because LSI did not provide appraisal services in connection with either plaintiff's loan, LSI was dismissed for lack of standing. *Spears v. Washington Mut., Inc.*, 2009 WL 605835 *2 (N.D. Cal. 2009).

[4] The Complaint incorporates by reference and attaches a September 16, 2011 article by Jeff Horwitz published in *American Banker*, entitled "Bank Mortgage Kickback Scheme Thrived Amid Regulatory Inaction." Doc. 1-2, Ex. A. The article generally describes the development of captive reinsurance agreements and explained that the practice was "slashing the [private mortgage] insurer's profit margins without reducing their risk." *Id*. at p. 4 of 32. It also specifically describes what happened to MGIC, the one PMI known to have attempted to address the fact that returns from this line of business were "unacceptable." *Id*. MGIC's CEO attempted to cap the total share of its premium it would share with a lender's captive reinsurance unit. MGIC did so with the expectation that others in the industry would follow suit. They did not, and lenders began withholding business from MGIC. MGIC eventually decided to reverse course due to "market forces." *Id*.

comprised of a small coterie of providers, including each of the Moving Defendants, who were aware of and kept track of each other's activities, a fact generally acknowledged by all the Private Mortgage Insurers, including Moving Defendants." Doc. 64 at 3 (citing Plaintiff's request for judicial notice, Exhs. A-D (excerpts from each of the PMI insurers' Forms 10-k acknowledging that the entire mortgage insurance market is limited to a small number of players)). But, the simple fact the industry is insular does not automatically transform multiple, parallel schemes into one unitary conspiracy.

Plaintiff cites *Interstate Circuit v. United States*, 306 U.S. 208, 222 (1939), for the proposition that a defendant's knowledge of other named co-conspirators' participation demonstrated the existence of an agreement to participate in an illegal scheme. But, Plaintiff glosses over the details of that case, in which individual motion picture distributors' knowledge of other distributors' participation in a price-fixing scheme was deemed sufficient to sweep all co-defendants into a single conspiracy only because "[e]ach was aware that all were in active competition and that without substantially unanimous action with respect to the restrictions for any given territory there was a risk of substantial loss of the business and good will of the subsequent-run and independent exhibitors, but that with it there was the prospect of increased profits." *Id*. at 222; see also In re Ins. Brokerage Antitrust Litig., 618 F.3d 300 (3d Cir. 2010) ("Key to *Interstate Circuit's* conspiracy finding was its determination that each distributor's decision to accede to *Interstate's* demands would have been economically self-defeating unless the other distributors did the same…."). Here, however, there is no allegation that collective action was helpful to the individual participants, let alone that failure to act in concert would be economically self-defeating. The price-fixing and anti-trust cases cited by Plaintiff are not analogous, because nothing in the current complaint suggests HSBC's captive reinsurance arrangement required participation of multiple PMIs. It just so happens that multiple PMIs chose to participate in HSBC's contractual arrangement.[5] There is

---

[5] The Complaint does allege that captive reinsurance schemes "have been widespread throughout the mortgage lending marketplace." Doc. 1, Compl., at ¶ 3. However, the complaint does not attempt to allege a conspiracy existed among and between all lenders and all PMI insurers active in the marketplace.

simply nothing in the complaint, apart from conclusory allegations of "collective" action, to suggest that the various PMI Defendants would have had any financial motivation to act in concert. In fact, it seems equally plausible that the each PMI contracting with HSBC would "prefer that fewer of its competitors participate in the scheme, as it would then enjoy that much more of the [] steered business." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 332.

Therefore, Plaintiff cannot establish he has standing to sue the Moving Defendants because he has failed to allege that any injury[6] he suffered is fairly traceable to the Moving Defendants' actions.[7]

### V. CONCLUSION AND ORDER

For the reasons set forth above, Moving Defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) for lack of standing is GRANTED WITH LEAVE TO AMEND. Plaintiff shall have one opportunity to amend the complaint in attempt to cure the deficiencies described herein. Any such amended complaint shall be filed within 30 days of electronic service of this order. Plaintiff is not afforded leave to alter any other aspect of his Complaint. Neither this order nor any amendment shall be deemed to disturb the partial stay, which remains in effect.

SO ORDERED
Dated:  May 25, 2012

                                              /s/ Lawrence J. O'Neill
                                                United States District Judge

---

[6] Moving Defendants also challenge the merits of Plaintiff's economic theory of injury, but do so for the first time in their reply brief. Both because this motion can be decided on other grounds and because Plaintiff has not had an opportunity to respond, the Court declines to address this issue at this time.

[7] This conclusion is not altered by the Complaint's allegations that each Moving Defendant knew of the wrongful "scheme" entered into by the other Moving Defendants but did not "report them to the appropriate authorities." Plaintiff points to no applicable disclosure requirement.